OLIS ADKINS, RESPONDENT, v. CHICAGO, ROCK ISLAND AND PACIFIC RAILWAY COMPANY, APPELLANTS.*

Kansas City Court of Appeals.   April 4, 1927.

*Corpus Juris-Cyc. References: Damages, 17CJ, section 425, p. 1101, n. 29; Evidence. 22CJ, section 601, p. 514, n. 17; section 639, p. 542, n. 1; Master and Servant, 39CJ. section 1263. p. 1043, n. 85; section 1387, p. 1204, n. 76; section 1443, p. 1262, n. 20; p. 1263, n. 24.

*Platt Hubbell* and *George H. Hubbell* for respondent.

*Luther Burns, Henry S. Conrad, L. E. Durham, Hale Houts* and *Spurgeon L. Smithson* for appellant.

BLAND, J.—This is an action for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $1624.88 and defendant has appealed.

The facts show that plaintiff, together with others including one Mastin, was employed as a section hand by the defendant in laying a new railroad track into a ballast pit. The work was progressing from south to north. Some of the men went ahead placing wooden cross-ties in position, east and west, and laying steel rails thereon, north and south. Plaintiff, Mastin and an employee by the name of Faulkner were spiking down the east rail which was being laid in advance of the west rail. The west rail was being spiked by other men who followed at a little distance to the south. Plaintiff and Mastin were driving the spikes and Faulkner was working as a "nipper." A nipper is one who is engaged in prying the tie to be spiked up against the rail by means of a claw-bar and holding the tie in that position while a spike is being driven into it on each side of the rail.

Plaintiff worked on the outside or on the east side of the east rail and Mastin on the inside or west side thereof. Plaintiff first measured the proper distance from the east end of the tie so as to ascertain the point at which the spike on the east of the rail was to be driven. The tie was then moved so that the point determined by the measurement should be against the east side of the rail. The nipper then raised the tie against the rail and plaintiff would start his spike on the east side, about an inch and a half from the north side of the tie. Mastin thereupon started his spike about the same distance from the south side of the tie. The two would then drive their respective spikes into the tie, striking alternately with their spike-mauls, plaintiff driving the spike on the east and Mastin the one on the west side of the rail. In performing their work of driving the spikes the two men would stand south of the tie in which the spikes were being driven, and on their respective sides of the rail, the two spikes being about six or six and one-half inches apart during the process of the driving.

Plaintiff was injured on the 2nd day of June, 1924, by a piece of metal breaking off of Mastin's spike-maul and flying into plaintiff's left arm. The injury occurred when the spikes had been driven about half way. Before plaintiff could get his maul off of the head of the

spike which he was driving, Mastin struck over the rail hitting the top or small part of plaintiff's maul, causing a particle of metal to chip out of the face of Mastin's maul as aforesaid. Mastin, testifying for defendant, stated that it was the custom for spike drivers to strike alternately and that he was following this custom at the time in question; that he struck plaintiff's maul because plaintiff allowed it to lean over the rail in front of the spike the witness was driving; that he at no time struck over the rail or on plaintiff's side of it. The testimony further tends to show that it was improper and dangerous for a spike driver to strike out of time, in other words, to fail to follow the custom of alternate striking.

The negligence pleaded in the petition is as follows:—

"While plaintiff Adkins, his said foreman and said two fellow servants were so driving spikes as aforesaid, and after the plaintiff Adkins had struck an outside spike with his spike-mault, said Hiram Mastin, without waiting for the plaintiff to remove plaintiff's spike-maul from said spike and from said rail, and without allowing the plaintiff a reasonable time in which to do so, did then and there, with a spike-maul which he then and there had and held in his hands, negligently strike at said spike, and negligently strike plaintiff's spike-maul with the spike-maul of said Hiram Mastin, and negligently strike said steel rail with the spike-maul of said Hiram Mastin, all of which striking with said spike-maul by said Hiram Mastin, was done while plaintiff's spike-maul was on and near said spike, and before the plaintiff had time to get his spike-maul out of the way, and before the plaintiff had time to dodge or get out of the way, himself, and without notice or warning to the plaintiff; and all of which striking by said Hiram Mastin was done hurriedly, quickly, suddenly, improperly, unexpectedly and negligently."

The answer consists of a general denial and pleads contributory negligence in that—

". . . plaintiff negligently caused and permitted a spike-maul to turn or lean over the rail in the path of the blow of a fellow servant; that if any dangerous method or manner of work was used by plaintiff's fellow servant, that plaintiff had full knowledge thereof and negligently continued to work with full knowledge thereof and negligently failed to inform defendant thereof."

Defendant insists that the court erred in refusing to give its peremptory instruction at the close of all the testimony because it is claimed that plaintiff was negligent in continuing to work with full knowledge of the alleged danger caused by the negligence of Mastin and without notice or protest to defendant. The evidence in reference to the claim of contributory negligence of plaintiff shows that he and Mastin were expert spike drivers and that they had been working

together in driving spikes for about two weeks before the injury. Plaintiff testified that shortly after they started to work, he noticed the Mastin was hitting "two licks to my one different times. I cautioned him different times in the two weeks—I called him down sometimes to get him to slow down on it. . . . It is dangerous to spike that way . . . this is the reason I called him down." He testified that he did not bring the matter to the attention of the foreman because "I didn't dictate to the foreman I worked for;" that he did not know whether the matter had been brought to the attention of the foreman in any other manner; that "I cautioned him (Mastin) twice that morning (of the injury) about driving so fast, that he should take his time, he couldn't gain nothing by it." He further testified that he did not remember whether Mastin had been striking out of time shortly prior to the injury. Mastin, as aforesaid, stated that he was striking alternately at that time. The evidence further shows that at the time of the injury Overton, the foreman, was about 150 feet south of the men and shortly thereafter went to where plaintiff was hurt.

We cannot say that plaintiff was guilty of contributory negligence as a matter of law because he continued to work with Mastin, knowing that the latter struck out of time at intervals and knew that it was dangerous to do so and continued to work with him without notifying or protesting to anyone but Mastin. There is some dispute between the parties as to whether Mastin habitually struck out of time or did this only periodically. The inference to be drawn from plaintiff's testimony is that Mastin was guilty of this continuously. Plaintiff testified that in order to get Mastin to slow down, the witness "called him down" and that he called Mastin down twice that morning. We infer that Mastin desisted for a period of time after being cautioned by plaintiff. However, if Mastin habitually struck out of time, as claimed by defendant, or even if he did this the greater part of the time, it may be inferred that the foreman knew of it because he was present and had charge of the men for the two weeks during which plaintiff and Mastin were working together. From the testimony of Overton it would appear that it would have been of no avail to have protested to him for the reason he stated that it was proper after the spikes were started for the spike driver to strike out of time if they so desired; that there was nothing wrong about the men hitting the spikes at the same time and no more dangerous than if they hit alternately.

While there is no direct evidence that Mastin was striking out of time at the time he hit plaintiff's maul, it may be inferred from plaintiff's testimony to the effect that Mastin struck over the rail and struck plaintiff's maul before plaintiff had an opportunity to withdraw his maul from the top of the spike; that Mastin was striking

out of time at the time of the injury. However, this was not the cause, or at least not the sole cause, of the injury. Had Mastin not struck over the rail even though he was striking out of time, the injury would not have happened. There is no evidence that Mastin had ever done this previous to the time plaintiff was injured. Plaintiff had no reason to foresee that Mastin would strike over the rail by reason of the fact that he at times had struck out of his turn. The evidence tends to show that such a practice of striking over the rail was highly improper, extraordinary and unusual. Defendant insists that the charge of negligence in the petition was not that Mastin struck over the rail but that he struck out of time. The negligence charged in the petition is a double barreled proposition but we think it states as one of the charges of negligence that Mastin struck over the rail. It alleges that "after plaintiff, Adkins, had *struck 'an outside spike* with his spike-maul" Mastin "without waiting for the plaintiff to move plaintiff's spike-maul from *said spike*," etc., Mastin negligently struck "*at said spike*" and struck plaintiff's spike-maul, etc. The petition contains other allegations broad enough to permit a showing that Mastin struck the rail (a place where he had no right to strike) or plaintiff's spike-maul when it was on the rail, but it certainly cannot be said that the gravamen of the negligence alleged was solely the striking of Mastin out of time. Rather it was a combination of his so striking together with striking at a place where he had no right to strike, that was the gist of the negligence charged. Under all the circumstances we do not think that plaintiff can be convicted of contributory negligence as a matter of law. We have examined defendant's cases and find the facts in the case at bar are wholly unlike those in the cases cited by the defendant.

Complaint is made of the refusal of the court to give defendant's instructions 10 and 11. These instructions are on the question of the alleged contributory negligence of plaintiff and were not proper instructions for several reasons. They were based upon the theory that the sole cause of the injury was the act of Mastin in striking out of time. They, in effect, tell the jury that what plaintiff conceded he failed to do, was contributory negligence and from what we have said in discussing the demurrer to the evidence, they were properly refused for this reason.

It is insisted that the court erred in permitting plaintiff over the objection of defendant to testify as follows:—

"Q. Tell the jury if your maul had been leaning toward the west and in the way of the stroke of Mr. Mastin what would have happened to your maul? . . . A. If he would hit it when it was leaning over the rail as he stated he would (have) knocked it over the rail out of my hands."

It is insisted that this was not proper expert testimony and that it was "a matter of common knowledge of which any juror or outsider would be as well qualified to express an opinion as one experienced in the work." It will be well remembered that plaintiff and Mastin were engaged in work with which the ordinary person is not usually familiar.

" 'Experience, skill and training may be applied in the common affairs of life. The test of admissibility is not the technical nature of the subject-matter with which the evidence deals, but rather whether the skill or experience of the witness, to whatever subject applied. technical or common, will aid and is necessary to aid the jury.' [17 Cyc. 229.] 'Those persons who are skilled in mechanical matters are competent to testify to relevant facts which are familiar in the mechanic arts. Such facts may be simple and involve little of the element of reasoning; as, for example, the action of natural laws, the limits of ordinary observation, the lightness or the tensils or other strength of materials or appliances, under what strain they are at a given time or how their strength is affected by given imperfections.' [17 Cyc. 71.] Thus, in Boettger v. Iron Co., 124 Mo. l. c. 104, this court said: 'The admission of expert testimony to show the effect of a knot or cross-grain upon the strength of a piece of timber, such as was in question in this case, is assigned for error. The following answer of the trial judge to the defendant's objection to that testimony is quite satisfactory: "The strength of the timber and other building material is a subject within the scope of the science of civil engineering. It is also, though to a less accurate degree, within the scope of a mechanic's skill; and, for the purpose of this case, a mechanic's opinion would doubtless have been as reliable as that of a civil engineer. And there may be many persons who are neither carpenters nor civil engineers, who have had sufficient experience with building material to be able to form very correct opinions about the strength of timber and the effect of a knot in a piece like the one in question, but still I think it is not a matter of such common knowledge that every one is presumed to understand it. Like many other points in arts and sciences with which people generally acquire some sort of familiarity, they still remain the subject of technical knowledge." ' The foregoing observations apply here. Upon the resisting capacity of the cleats as nailed to the brace, depended the reasonable sufficiency of the appliance which defendant through and by its foreman tendered to plaintiff and requested him to perform his work. It was a vital question in the case and as we have seen was not a matter of such common knowledge that every one is presumed to know how many nails were necessary to render them reasonably safe for a man to impose his weight, but a matter upon which the cou-

ceded experts radically differed." [Combs v. Construction Co., 205 Mo. 367, 391, 392.]

A certain discretion is permitted the trial court in the admission of the testimony of this kind (22 C. J. 514) and we do not feel that that we would be justified in reversing the case on account of the admission of this testimony, although the trial court would have been fully within his right had he excluded it. There was no error in the court's permitting plaintiff to testify as to the proper way in which to drive spikes. [Buckalew v. Rd., 107 Mo. App. 575, 586; Meily v. Rd., 215 Mo. 567, 590; Transportation Line v. Hope, 95 U. S. 297, 208.] The court permitted plaintiff over the objection of defendant to show that men working for another railroad company were instructed by that company to drive spikes by striking alternately, and this is urged as error. This was upon redirect examination of the witness after the defendant had gone into the matter by asking the witness as to what were the rules and regulations of the other railroad in reference to the manner of striking spikes and by asking the witness if it was not true that with that company it was "left up to the individual man who was doing the work?"

Plaintiff's attorney in his closing argument to the jury stated, "They tell you to consider it the same as an individual. That's all right, if you take a man like J. Pierpont Morgan." Thereupon an objection was made which was overruled; counsel did not go further into whatever matter he had then in mind. Counsel later stated, "I never had a case yet, and I have been practicing thirty-four years, and never yet had a case where a doctor—" here objection was made which was overruled, counsel then stating, "Dr. Bristow is not entitled to be believed or considered in this case." Later counsel stated, "You know this suit would have been brought for more than $2999.99." Thereupon objection was made which was overruled and counsel continued by saying, "I will say this, the railroad owed Mr. Adkins more than $2999.99." And in his opening argument one of counsel for plaintiff stated, "In this case like all other cases, they immediately pull a statement." Whereupon objection was made and it was overruled and counsel continued, disclosing that the statement that he referred to was one taken from plaintiff by Dr. Bristow, one of defendant's physicians. This statement taken by the doctor, contained facts which, if true, would make any recovery by plaintiff impossible.

The remark of counsel for plaintiff in his argument to the jury that "in this like all other cases they immediately pull a statement" in reference to the statement from plaintiff taken by Dr. Bristow, we do not think was wholly improper. Dr. Bristow testified that he has been preparing such statements for thirty-nine years, sending one copy to the chief surgeon of the defendant and the other to the

claim department. It may be fairly inferred that these statements were taken for the purpose of being used in lawsuits in case they were brought. We cannot say that the remark of counsel in reference to this matter was so far out of the realm of reasonable comment that we would be justified in disagreeing with the trial court and hold that it was prejudicial.

We think that plaintiff's counsel was treading upon dangerous ground in making reference to J. Pierpont Morgan and suggesting that the suit would have been brought for more than $2999.99. However, before stating in what connection plaintiff's counsel was using the name of J. Pierpont Morgan and before explaining why the suit would have been brought for more than $2999.99, objections were made and counsel desisted from pursuing these matters to a harmful conclusion. It was stated by the Supreme Court in the case of Lefever v. Stephenson, 193 S. W. 840, 844—

"We have frequently said that the propriety of the conduct of counsel during a trial rests largely with the trial court, and it is only in cases where it is apparent from the facts in the particular case that such conduct was prejudicial have we interfered with the verdict on this account."

Defendant has failed to point out and we fail to find where the conduct of plaintiff's counsel was prejudicial; defendant insists that the verdict is excessive but it is apparent there is no merit in this contention.

The facts in reference to the point that the verdict is excessive show that the piece of steel that entered plaintiff's left arm was about two-fifths of an inch in diameter and had sharp edges. Plaintiff's testimony tends to show that there was no evidence that it was incapsulated at the time of the trial. Soon after his injury plaintiff's arm became swollen and red, bloody matter and pus running out of the wound. This infection lasted about two weeks. An X-ray picture, taken by plaintiff's physician, shows that the piece of steel is imbedded in the left arm close to the large bone and a trifle closer to the elbow than to the shoulder. It was the opinion of his physician that this piece of steel traveled through the biceps muscle and lodged near the musculospiral nerve and that the pain in the arm might be due to the piece of steel impinging upon a branch of the nerve or it might be brought about by the movement of the muscles actuating the steel and thus causing laceration. At times, when plaintiff uses the arm in working, kernels and knots form, which are caused "from mechanic irritation and setting up some inflammatory reaction" brought about by the presence of the steel. After plaintiff stops work these knots and kernels disappear. These formed four or five different times before the trial. Plaintiff testified that he had suffered

from pain continually since he was injured; that the pain is in the wrist and aches up and down his arm. The pain "seems to start where the steel penetrated down to the center of the wrist." He was unable to do any work until the winter following his injury and he is not and has been unable to do heavy work without great pain. He can do light work although the arm pains him when he uses it. He was earning $2.80 a day at the time of the injury. The expert medical testimony shows that such an object as a piece of steel should be removed by an operation "when it is producing disturbing and dangerous symptoms if the removal is possible, and if the operation does not endanger or necessitate operative trouble which will produce more in effect that (than) will arise from allowing the missile to remain." We take it from the testimony that an operation is the proper procedure in a case like plaintiff's but as to what would be the danger accompanying such an operation, is not clear. However, we think it quite apparent that a verdict of $1624.88 is not unreasonable under all the circumstances.

The judgment is affirmed. *Arnold, J.*, concurs; *Trimble, P. J.*, absent.